# EXHIBIT 1

**STATE OF MICHIGAN**
**KENT COUNTY CIRCUIT COURT**
**17th CIRCUIT COURT**

LORENE ROSKAMP, an individual
Michigan resident; DAVID ROSKAMP,
an individual Michigan resident; and
ELIZABETH MARCUS, an individual
Michigan resident,

       Plaintiffs,               Case No.

v.                                Hon.

GRACE CHRISTIAN UNIVERSITY,
a Michigan nonprofit corporation;
JAMES PETER COOLEY, an individual
Michigan resident; and MORGAN MARIE
WOLFFIS, an individual Michigan resident,

       Defendants.

## COMPLAINT – CIVIL CLAIMS – JURY DEMAND

CLANCY ADVISORS PLC
Saura J. Sahu (P69627)
Jeffrey S. Appel, Of Counsel
(P28296)
2723 S. State St., Suite 150
Ann Arbor, MI 48104
(734) 780-7595
sahu@clancyadvisors.com
*Attorneys for Plaintiffs*

1

Plaintiffs Lorene and David Roskamp and Elizabeth Marcus hereby state their civil claims against Defendants Grace Christian University (**"GCU"**), James Peter Cooley (**"Cooley"**) and Morgan Marie Wolffis a/k/a Morgan Cooley (**"Wolffis"**), seeking a judgment jointly and severally against them in an amount of at least $10,000,000.00, as follows:

## **INTRODUCTION**

1.    This case concerns witch hunts, dream-based recovered memory theory, and the responsibility of those who enable and conduct such destructive activities. Witch hunts involve life-destroying accusations based on dreams, intuitions and rumors, without reliable factual corroboration or confirmation. Among recent witch hunts are the false accusations of child sexual misconduct that are based on unreliable dream interpretations, hypnosis, sleep deprivation and so-called "recovered memories." Even when practiced by licensed professionals within clinical limits, recovered memory theory is questionable and controversial. (*See* Exh. 1.) It is therapeutically unsound and personally destructive when practiced by laypersons – like asking an accountant to perform heart surgery.

2

2.      Personal and organizational liability for witch hunts is well settled. Around 1692, the people of Salem, Massachusetts relied upon dreams and visions as "evidence" to accuse 188 residents of witchcraft, hold trials for 144, obtain 54 false confessions, execute 19 people and torture another person to death. By 1711, the Massachusetts colonial government not only exonerated all of them, but also paid the accused and/or their families a then-significant financial sum.

3.      Coming to prominence in the late 1980s, recovered memory theory was always controversial. By the late 1990s, its leading promoter already mostly repudiated it, after false criminal convictions and other failings came to light. Yet some professionals continued to practice it to damn well-regarded people, including those who offered compelling exonerating evidence where allegations could be objectively disproven. (*See* Exh. 2.) Today, recovered memory theory remains highly controversial even when practiced by licensed professionals within cautious limits.

4.      Defendants Cooley and Wolffis neither hold any professional licenses nor hold any particular academic qualification worthy of

teaching a college course. They practice recovered memory therapy without reasonable limitation and teach others to do the same.

5.   While in his 30s, Defendant Cooley sought out opportunities to supervise young college women by overseeing their internships. He dated and "married" one of his interns, Defendant Wolffis, while taking another, Plaintiffs' daughter Elle Roskamp, as his live-in maid and nanny. At the time, Elle was a highly impressionable young woman who had begun to manifest objective signs of delusional thinking, which needed care not exploitation.

6.   Under Defendant Cooley's in-home and on-campus instruction, Cooley convinced Elle first that her father had sexually abused her and then that the entire family composed an evil murder-sex-human trafficking ring. If Cooley or Defendant GCU had done any due diligence whatsoever (beyond Cooley's purported dream interpretations), they would have known that the accusations were so factually preposterous as to be surely false. The college would also have seen that Cooley was unfit to supervise Elle's internship and that Elle needed mental health counseling as a result.

7.    Despite being a college open to the public, Defendant GCU failed to do anything of substance before allowing Defendant Cooley to participate in college activities or to supervise Elle in her official, for-credit college internship classes. Thus, it did not see the obvious red flags that any normal college would see, such as that Defendant Cooley lived with Elle, dated and married his former intern, practiced recovered memory theory without a license, or took any number of other manipulative and controlling harmful actions toward her as a young woman. Instead, the college simply accepted Defendant Cooley as an authorized agent and gave him authority over Elle. This approach was consistent with Defendant GCU's broader lax attitude toward questionable conduct by older men toward female students, and by internship supervisors toward interns.

8.    As a result of Defendants' misconduct, the Roskamp family relationships have been destroyed, their reputations irretrievably damaged and their ability to obtain mental healthcare for their vulnerable family member, Elle, has been mostly undermined. Plaintiff Lorene Roskamp faces the prospect of a terminal illness and Plaintiff David Roskamp faces substantial health complications. Amid abundant

grief, they do not expect to see their daughter again. This lawsuit seeks a recovery for the family partly with the hope that by remedying existing harms and losses, the family might remain in a position to help restore Elle to mental health if and when the siblings reconcile after the parents are gone.

## PARTIES, JURISDICTION AND VENUE

9.     Plaintiff Lorene Roskamp (b. 1961) is an individual residing with her husband David Roskamp in Ada, Michigan 49301. She has lived her entire life in the Grand Rapids metropolitan area.

10.     Plaintiff David "Dave" Roskamp (b. 1960) is an individual residing with his wife Lorene Roskamp in Ada, Michigan 49301. He has lived his entire life in the Grand Rapids metropolitan area.

11.     Plaintiff Elizabeth Marcus (b. 1994) is an individual residing in Grand Rapids, Michigan 49506. Marcus is the Roskamps' oldest daughter. She has lived her entire life in the Grand Rapids metropolitan area. Having graduated with her Bachelor of Nursing degree from Hope College in 2016, she works in prenatal and neonatal healthcare and lives with her husband and their infant son.

12.    Defendant GCU is a Michigan nonprofit corporation having its principal place of business and its resident agent, Ken Kemper, located at 1011 Aldon Street S.W., Grand Rapids, MI 49509.

13.    Defendant Morgan Marie Wolffis (b. 1996) a/k/a Morgan Cooley is an individual who, upon information and belief, resides with her mother, Janet Wolffis, and Cooley at or around 3248 Camrose Drive, Hudsonville, MI 49426-8822. Upon information and belief, Wolffis graduated from Kuyper College in or around 2020, is unemployed, and does not have or maintain any professional licenses.

14.    Defendant James Peter Cooley (b. 1986) is an individual who, upon information and belief, resides with Wolffis at or around 3248 Camrose Drive, Hudsonville, MI 49426-8822. Upon information and belief, Cooley graduated with an associate's degree in general studies from Grand Rapids Community College in or around 2008, and with a bachelors in business management from Davenport University in or around 2013. Cooley does not have or maintain any professional licenses and appears to have been self-employed since 2017.

15.    Defendants Cooley and Wolffis present and conduct themselves as husband and wife, although Plaintiffs have not yet located

7

an official civil record of the marriage. Upon information and belief, Defendants held a marriage ceremony in 2018 and had a son in June 2019 who they still parent together. The rest of the Complaint treats them as if they are married.

16.     The Court has jurisdiction to hear this tort action under MCL § 600.601. The amount in controversy exceeds $100,000.

17.     This Court is the appropriate venue under MCL §§ 600.1629 and/or 600.1621 because (a) the original injury occurred here; (b) Defendants reside, conduct business and/or have their registered office here; and/or (c) Plaintiff resides here.

### **GENERAL ALLEGATIONS**

### **Early Foundations of the Roskamp Family**

18.     Now in their early 60s, Plaintiffs Lorene and David Roskamp have lived in the Grand Rapids metropolitan area their entire lives.

19.     Plaintiff Lorene Roskamp is the second of seven children and the oldest daughter to a farmer and a homemaker. Both her parents were observant Calvinists throughout her childhood, including after they divorced around the time of her college years.

20.    When Plaintiff Lorene Roskamp was a teen, her family did not earn much money. By her mid-teens, Lorene's father took a job on the road to help earn money, and he was not home often. Lorene's mother worked numerous jobs to raise the children. Although money was sparse, she managed to put all of them through private Christian schools.

21.    Plaintiff Lorene Roskamp's mother and family participated actively in church, and the church in turn helped the family during its hard times.

22.    From her teenage years onward, Plaintiff Lorene Roskamp helped her mother to raise the other siblings (including a sister with Down's Syndrome and a foster son), to tend the garden, to perform household chores and to do everything else that made the household properly run despite its humble and difficult circumstances.

23.    As a result of her childhood experiences, Plaintiff Lorene Roskamp was openly adamant that her children would not have to endure such hardship. Plaintiff Lorene Roskamp worked hard, pursued a college education, strove for professional success and financial stability, and sought to create a home in which her children could grow and thrive.

24.   After studying at Calvin College and the internationally renowned Kendall College of Art and Design, Plaintiff Lorene Roskamp graduated with a Bachelor of Fine Arts degree and embarked on a career in interior design. Over the last four decades, she built a highly regarded design practice serving local, national and international clientele – all while raising a family and participating actively in her church and community.

25.   Plaintiff David Roskamp is the fourth of five children, born to a local homemaker and a builder who owned and managed a successful building business.

26.   Both of Plaintiff David Roskamp's parents were active members in the Christian Reformed Church throughout his life. They sent him and all his siblings through Christian schools.

27.   Plaintiff David Roskamp and his siblings grew up in a well run and well disciplined household in which they each had a variety of chores but also time to go outside and play. As a teen, David would cut the grass, vacuum and perform other chores. Around the time of junior high school and onward, he helped his father in the building business, performing lower-level manual and clean-up labor and learning the

trade. During this period, David was also active in team sports, playing varsity football, church basketball, volleyball and other sports.

28.   Plaintiff David Roskamp was close with his family. When his older brother, who was diagnosed as a child with juvenile diabetes, later needed a kidney transplant in his twenties, David donated his kidney.

29.   In or around the time when Lorene was helping to raise her siblings and starting a career, Plaintiff David Roskamp was also beginning his business career. He had grown an affinity for business while working with his father.

30.   In the early 1980s, Plaintiff David Roskamp earned his associate's degree from Davenport University, after which he spent roughly two decades in inside sales, operations management and outside sales for a large corporation, roughly five additional years in outside sales of industrial goods, and roughly a decade or more in the metal fabrication industry.

31.   In March 1993, amid their early 30s, Plaintiffs Lorene and Dave Roskamp married and started a family. They had their first daughter, Plaintiff Elizabeth Marcus, a little over a year later in 1994,

with Elle Christian Roskamp following in 1997, and Charlie Roskamp in 1998.

### Greenbrier Street

32.    From early 1995 until 2011, the Roskamp family owned their home at 274 Greenbrier Street SE in Grand Rapids. The home (pictured below) is a pleasant 2-story house in a conservative, middle-class community, with nearby neighbors and a backyard roughly adjacent to Collins Elementary School.



33.    Throughout the time they lived on Greenbrier Street, the Roskamps knew their neighbors relatively well, sent each of their children to Collins Elementary School, were active participants in their community association, and lived a life relatively open to others' view.

34.   Throughout the time the Roskamps lived on Greenbrier Street, Elle enjoyed an appropriately close and affectionate relationship with her father, who she adored during that period. Plaintiff David Roskamp enjoyed fathering all his children and greatly valued his role as a parent. A loving and protective mother, Plaintiff Lorene Roskamp nurtured and protected her children while actively prodding them verbally to do their best and to achieve excellence. Neither Lorene nor David adopted physical disciplinary practices in their parenting approach.

35.   Throughout the time the Roskamps lived on Greenbrier Street, Elle was also very close with her sister, Plaintiff Marcus. Among other things, they played, swam and changed clothes together, and over time Marcus helped to care for Elle. They confided in one another, and Elle often sought advice from Marcus, including about love relationships.

36.   If any abuse had occurred in the Plaintiff-Roskamp household, Marcus would have seen some sign of it. There was none. It did not happen.

37.   Over their years on Greenbrier Street, the family worked hard. As a result, Elle and the other Roskamp children would stay or

vacation with Plaintiff Lorene Roskamp's sister and brother-in-law – Ryan and Rebecca Stygstra – and their children. These stays often lasted for days at a time.

38.   During Elle's stays with the Stygstras, Rebecca would swim with Elle as a toddler, change her diapers or clothes, bathe her and otherwise care for her as she grew older.

39.   Rebecca Stygstra and Elle grew close. Over the years, Elle confided in Rebecca, including about sexual matters.

40.   If any abuse had occurred in the Plaintiff-Roskamp household, Rebecca Stygstra would have seen some sign of it. There was none. It did not happen.

41.   At no time during the entire period on Greenbrier Street did Plaintiff David Roskamp engage in any sexually inappropriate behavior with Elle Roskamp (aged 0-16), or allow anyone else to do so. The same is true with respect to his conduct with the other two Roskamp children.

42.   At no time during the entire period on Greenbrier Street did Plaintiffs Lorene Roskamp or Elizabeth Marcus participate in, aid, abet, tolerate, ignore or see any sign of any sexually inappropriate behavior involving Elle Roskamp or anyone else on the property.

43.   If the Roskamp family had operated a pedophilic human trafficking and sex ring involving child murder during their residency on Greenbrier Street near Collins Elementary School – which is so false as to be preposterous – someone nearby would have noticed. It never happened.

44.   As for criminal or other background information to date, none of the Plaintiffs or their spouses or children has had more than a traffic ticket.

45.   Insofar as it requires saying here, none of the Plaintiffs ever committed homicide, helped (let alone forced) Elle to obtain an abortion, or engaged in any sexual assault, public corruption or human trafficking. Neither Ryan nor Rebecca Stygstra participated in any such conduct. These things didn't happen.

46.   As a result of Defendants' dream therapy and other misconduct described herein, Elle now falsely accuses the Roskamps of committing murder, child vaginal rape, human trafficking, public corruption with local police departments (which are also purportedly part of the organized criminal ring) and other evil, extreme and/or unlawful

conduct during her childhood (i.e., in or around 2000 to 2010, while they were living on Greenbrier Street).

### Thornapple River Drive

47.   In 2013, around the time when Elle was 15-16 years old, the Roskamp family purchased a larger home in an upscale conservative neighborhood at 2278 Thornapple River Drive Southeast, Grand Rapids, MI 49546. The home was a two-story, five-bedroom ranch house (pictured below) with large windows, open spaces and a walkout basement and deck leading to the Thornapple River. As of the filing of this Complaint, Plaintiffs do not believe Elle alleges any misconduct toward her at this location, and – in fact – none occurred.

 

### Ada, MI

48.   By early 2016, the Roskamp family moved to Ada, where they purchased their current home in another quiet, upscale, conservative

community. As before, they have been active in their community, developed relationships with their neighbors and lived a life relatively open to others' view. As of the filing of this Complaint, Plaintiffs do not believe Elle alleges any misconduct toward her at this location, and – in fact – none occurred.

49.    Plaintiff Lorene and David Roskamp also own a property on Torch Lake in Michigan. As of the filing of this Complaint, Plaintiffs do not believe Elle alleges any misconduct toward her at this location, and – in fact – none occurred.

## Elle Before College

50.    Throughout her childhood and teenage years, Elle was bubbly and upbeat, but also naïve and lacking in many friends at school. Her strong identification as a Christian throughout life – a trait cultivated at home – might have alienated her from childhood peers. During this time, she outwardly told others she was comfortable with Jesus being her best friend.

51.    During her teens, Elle became more and more involved in church activities that involved the notion of prophecy, and she started to view herself increasingly as a prophet. She began to say that God

communicated directly with her and to value her personal and social identity as a prophet.

52.    During high school, Elle apparently only had one significant friend, and that relationship might have become marred by some degree of sexual aggression that left Elle feeling ashamed.

53.    Elle felt comfortable enough to confide in her parents and then with other family members about the friend's sexual aggression toward Elle. Plaintiffs David and Lorene Roskamp and the rest of the family supported Elle though this process and through her efforts to overcome shame and to heal.

### Elle's Freshman Year with Defendant GCU

54.    In the Fall of 2016, Elle matriculated to Defendant GCU.

55.    Like other colleges, Defendant GCU knows – and it is eminently foreseeable – that young people shape their identities during the undergraduate years. While being technically adults in the eyes of the law, college students are foreseeably malleable and vulnerable to the predations of outsiders and to each other, in ways that foreseeably can destroy individuals, their families, and their family relationships.

56.   Like other colleges, Defendant GCU can readily foresee the need to provide a safe campus and environment, and it has a significant degree of legal and moral responsibility to do so.

57.   In light of Elle's naivety, relatively sheltered life and fewer number of friendships, among other things, Elle was especially vulnerable to the manipulations and advances of others – especially people of romantic or social interest who promoted her identity as a prophet.

58.   Over the course of her freshman year at Defendant GCU, Elle continued to write positively in her journals about Plaintiffs David Roskamp and Elizabeth Marcus, as well as about her brother and family, and she thanked the Lord for them. These writings reflect an appropriate closeness with her father and her appreciative reliance on her family for emotional support.

59.   Over the course of her freshman year at Defendant GCU, from a civil and secular perspective, Elle began to outwardly manifest mildly delusional behavior with increasing frequency. For Elle, prophecy, divine revelation and her role in them were expressly important. As a result, for example, she expressed disagreement with Defendant GCU's teachings

against spontaneous worship guided by the Holy Spirit and its approach to interpreting the Bible academically instead of through the revelation of the Holy Spirit. Debates over the merits of the college's teachings are of no importance to this lawsuit. Certain teachings are noted only as a matter of fact, in relation to their psychological, legal or other civil significance.

60.    Throughout her freshman year at Defendant GCU, Elle had properly and appropriately loving and affectionate relationships with her family. She was emotionally close with Plaintiffs Lorene and David Roskamp and Elizabeth Marcus, and she communicated regularly with them.

61.    Throughout her freshman year at Defendant GCU, Elle and the Plaintiffs Lorene and David Roskamp and Elizabeth Marcus continued to enjoy the kind and quality of relationships that people who prioritize family value – being buoyant in joy and supportive in sorrow or hardship, while providing mentors or confidants when needs arise. During this period, the Roskamps were still fortunate to have healthier parent-child relationships than many enjoy. Their stability also helped

to keep Elle balanced and on-track, despite some growing tendencies to see herself as a visionary "prophet" to whom God spoke directly.

62.    During her freshman year at Defendant GCU, Elle talked to confidants about sexual issues and relations. Upon information and belief, Elle was not substantially sexually active, and she was comparatively naïve about sex. She never mentioned her father or family in relation to any sexual conduct.

63.    Throughout her freshman year at Defendant GCU, during non-sexual conversations, Elle regularly mentioned how much she admired Plaintiff David Roskamp.

64.    On or about February 6, 2017, during Elle's freshman year, Elle began a relationship with a certain young man, referred to here as "J."

65.    Elle and J went out on their first date on February 11, where upon information and belief they kissed and might have engaged in other romantic activity.

66.    By early Summer 2017, Elle became frustrated by what she viewed as God's will that she break up with J due to conduct she viewed

21

as being sexual, and she equated this break-up with Abraham's sacrifice of Isaac.

67.    At least by June 2017, Elle was also convinced – through dreams and purported prophecies – that she would reunite with J, marry him, and have his child.

68.    When Elle openly told friends and family about the "revelations" concerning J in the preceding two paragraphs, they reasonably found these comments troubling in relation to her mental state. Yet they also assumed that it could pass like ordinary breakup sadness.

69.    Despite her prior certainty, Elle and J never reunited or had children.

70.    Around the Summer 2017, Elle also expressed aggravation with her parents' disapproval of Plaintiff Elizabeth Marcus's then-boyfriend (now husband). Elle began to express a split with her parents, but she also spoke positively of them and their support for her.

## Elle's Sophomore and Junior Years –
## Developments with Cooley and Wolffis

71.     By the latter half of her sophomore year, Elle apparently was becoming less happy at Defendant GCU. In Spring 2018, Elle met Defendants Cooley and Wolffis at Defendant GCU.

72.     As part of Defendant GCU's activities, Elle led a small group discussion together with another student. The group's participants introduced Elle to Defendant Cooley, as a leader in Burn 24/7 – an immersive evangelical group.

73.     At the time, Defendant Cooley was roughly 32 years old, and he was dating his 22-year-old intern, Defendant Wolffis, who was studying at Kuyper College.

74.     Upon information and belief, Defendant Cooley participated in Elle's small group as a speaker and/or mentor.

75.     Elle reportedly began spending a substantial amount of time talking with Defendant Cooley and secluding herself from prior friends and family. As a result, Elle also spent a substantial amount of time with Defendant Wolffis. Elle was sometimes gone from Defendant GCU's campus for weeks at a time.

76.     In June 2018, Defendant Wolffis asked Elle to move in with Defendant Cooley and her. Around that same time, Elle wrote about cuddling with Wolffis and talking with her about sex late into the night.

77.     Wolffis has claimed to have had a very difficult time while she was growing up, and she exhibits an ongoing preoccupation with issues of child sexual abuse.

78.     Over the course of Elle's junior year, from Fall 2018-Spring 2019, Elle spoke glowingly and in semi-romantic terms about Defendant Cooley, saying at some point that she wanted to find her "James."

79.     When Elle developed another romantic interest with a male student in whom she saw God's calling, Defendant Cooley steered Elle away from him.

80.     Late in her junior year, Elle apparently moved in with Defendants Cooley and Wolffis. At the time Wolffis was pregnant, and Elle performed household chores as a live-in maid. Defendant Cooley apparently claimed that Elle's free labor enabled him to focus on his "ministry."

81.     Throughout her junior year, Elle participated in extended dietary fasts and sleep deprivation at Defendants' direction through their immersive approach.

82.     Under the immersive approach of Defendants Cooley and Wolffis, Elle was required to have absolute and primary devotion above all other ordinary human pursuits.

83.     Throughout her junior year, Elle objectively exhibited increasing delusional tendencies.

84.     Throughout her junior year, Elle's tension with Plaintiffs Lorene and David Roskamp and Elizabeth Marcus increased.

85.     After moving in with Defendants Cooley and Wolffis, and as a result of their influence and Elle's interactions with them, Elle began to rely more heavily and blatantly on dreams as being direct communications from God.

**Elle's Senior Year and the Breaking Point at Defendant GCU**

86.     By June 2019, Defendants Cooley and Wolffis had their baby, and Elle became not only a live-in maid, but also their live-in nanny.

87.     During her senior year, Elle took a Defendant GCU class starting in or around September 2019, for which Defendant GCU

required her to obtain an internship supervisor (equivalent and referred to herein as GCU's "internship professor").

88.     Defendant GCU provided credit for the course, set forth certain course requirements, and purported to internally supervise the course through its student affairs department.

89.     Elle proposed to have Defendant Cooley – with whom she lived and in whom she had an unhealthy personal interest – as her GCU internship professor.

90.     Upon information and belief, Defendant GCU did not engage in any due diligence concerning Defendant Cooley as its internship professor. If it had, it at least would have discovered that Elle lived with him and was his maid and nanny, and there is a substantial probability it would have discovered that Defendant Cooley dated and married his former college intern, Defendant Wolffis.

91.     Upon information and belief, Defendant GCU did not engage in any due diligence concerning the organizations and so-called ministries of which Defendant Cooley was a member and/or leader. If it had, it would have discovered practices that require heightened scrutiny to avoid the exploitation and abuse of its students.

92.     Upon information and belief, Defendant GCU did not provide any training for Defendant Cooley as its internship professor.

93.     Upon information and belief, Defendant GCU did not conduct any supervision over Defendant Cooley's activities as its internship professor.

94.     Defendant GCU did not provide training for Elle, in relation to her status as an intern or as a vulnerable student dealing with substantially older supervisors.

95.     Upon information and belief, Defendant GCU materially failed to enforce its own requirements as to Elle or to substantially oversee Elle's work in the internship.

96.     Upon information and belief, during the course and within the scope of performing his internship-professorship supervision of Elle, upon information and belief, Defendant Cooley continued to require and forcefully persuade Elle to participate in extended sleep deprivation and fasting.

97.     Upon information and belief, during the course and within the scope of performing his internship-professorship supervision of Elle, Defendant Cooley demanded that Elle return early from her

Thanksgiving Break with the Roskamp family, that she remove herself from her own family, and that she seclude herself with him and Defendant Wolffis.

98. Upon information and belief, during the course and within the scope of performing his internship-professorship supervision of Elle, Defendant Cooley used recovered memory theory in November 2019 to practice psychological counseling, to "interpret" Elle's dreams, and to aid and abet Defendant Wolffis's "interpretation" of Elle's dreams. Relying on recovered memory theory, Defendants Cooley and Wolffis each counseled Elle at that time and convinced her that her dreams meant that her father sexually abused her as a young child.

99. Thereafter, during the course and within the scope of performing his internship-professorship supervision of Elle throughout her senior year, upon information and belief, Defendant Cooley continued on numerous occasions to practice psychological counseling using recovered memory theory, to "interpret" Elle's dreams thereby, and to aid and abet Defendant Wolffis's "interpretation" of Elle's dreams. Defendants Cooley and Wolffis thereby guided, claimed and convinced Elle of an increasingly broad scope of evildoing including claims that her

father sexually abused her as a young child, that he passed her around a criminal sex ring over a course of years, and that her mother, sister Elizabeth, brother Charlie, Aunt Rebecca Stygstra and Uncle Ryan Stygstra (and many others) all participated in rape, murder, human trafficking and other evil conduct.

100.  During the course and within the scope of performing his internship-professorship supervision of Elle throughout her senior year, Defendant Cooley assisted in creating and producing videos and/or statements for publication in which Elle made the false accusations of criminal conduct above. Upon information and belief, Cooley provided or obtained material resources to make the videos, provided verbal content and promoted the videos' and/or statements' publication.

101.  As a result of Defendants Cooley's and Wolffis's counseling in the course of Cooley's role as an internship professor for Defendant GCU, Elle claims now to have memories of conduct as described in the two preceding paragraphs. Since these things did not actually occur, they are false memories.

102.  Had Defendant Cooley or Wolffis performed any reasonable diligence or factual investigation before issuing their "interpretations,"

they could not reasonably find any corroboration for their theory. In fact, none exists because the misconduct did not occur.

103.  When presented with an accusation of sexual abuse, it is possible to trust the complainant while still verifying or examining the surrounding facts to avoid uncorroborated or potentially disproven witch hunts.

104.  Recovered memory theory is a highly controversial approach originating in the field of psychology and having its only arguably legitimate, professional grounding there. Outside that field, it is rootless and has no other reasonable and non-fraudulent basis for application or treatment.

105.  Recovered memory theory exhibits a substantial and primary preoccupation with "recovering" previously non-existent or non-conscious, subjective visualizations of child sexual abuse. Its practitioners actively look for such memories and treat a wide variety of otherwise common psychological conditions and disorders as evidence of child sexual abuse.

106.  Even within the discipline of psychology, competent and trained professional counselors must observe important limits and

constraints to avoid the unreasonable risk of unduly influencing a person to construct false and damaging "memories," which they never experienced before but which they can be "helped" to visualize and commit to memory through leading questions, counseling and repetition.

107. Even within the discipline of psychology, competent and trained professional counselors must observe important limits and constraints to avoid attributing relatively common conditions – such as anxiety or depression – as indicators that every such person has experienced child sexual abuse.

108. Defendants Cooley and Wolffis have never been licensed to practice psychology or any other form of mental health counseling or healthcare.

109. Neither Defendant Cooley nor Defendant Wolffis took reasonable steps to avoid harming Elle or any member of her family through their practice of recovered memory therapy to elicit family-based memories.

110. Neither Defendant Cooley nor Defendant Wolffis took reasonable steps – as ordinary human beings and laypeople – to avoid

harming Elle or any member of her family through their promotion and publication of false and defamatory statements about her family.

111.  If Defendant GCU had done anything to guide or supervise Defendant Cooley as an internship professorship, it would have denounced his actions and/or approach described above and/or removed him from his position of authority over Elle.

112.  Defendant Cooley's specious and "revelation"-based dream interpretation appears to contradict Defendant GCU's own teachings. Entirely separate from any issue as to the merit of Defendant GCU's teachings, upon information and belief, Defendant GCU did not enforce its own then-existing standards and instead did nothing relevant or material at all.

113.  Upon information and belief, if Defendant GCU had conducted diligence in relation to Defendant Cooley and the organizations of which he is a member or leader, it would not have placed him in a position to oversee her.

114.  Upon information and belief, if Defendant GCU had trained Defendant Cooley, he would not have harmed her by negligently

exacerbating the weaknesses in her mental health and influencing her to concoct harmful delusions of evildoing.

115. Upon information and belief, if Defendant GCU had supervised Defendant Cooley, it would not have allowed him to live with her, which would have materially interrupted his unfettered and constant access to her while he reinforced improper theories about her dreams.

## Campus Culture at Defendant GCU

116. The Roskamp's experience apparently was not the first time a Defendant GCU internship caused the splintering of a family through the negligent, fraudulent or reckless introduction of false divisions.

117. Upon information and belief, at the hands of another internship professor, another female student-intern previously was persuaded to denounce her family without cause, to run away to another State and to become estranged from them.

118. Although aware of the situation in the preceding paragraph, Defendant GCU did not respond by instituting formal or meaningful changes to its internship program to protect interns and their families

from unjustified harm. Had it done so, upon information and belief, the Plaintiffs would not have suffered the harms here.

119. Defendant GCU's failure to take such actions above was consistent with its broader culture of disregard for abuse.

120. During Elle's freshman year, female students reported to Defendant GCU's official who supervised student affairs (namely, Kyle Bohl) certain ongoing sexual harassment by a male, on-campus work supervisor who was at least 30 years older than them. Upon information and belief:

    a. Bohl first proposed to privately talk with the supervisor "man-to-man," and discouraged escalating the issue formally to Defendant GCU's Vice President Brian Sherstad.

    b. The students instead insisted on escalating the issue.

    c. For more than a month thereafter, Defendant GCU took no action and left the same supervisor in charge of young women until one of them returned to Bohl to complain.

    d. Admitting that the matter had not been escalated and that no action had been taken, Bohl apparently then escalated the matter to Vice President Sherstad.

e. Although the women's work supervisor reportedly endured a brief discipline, one reporting student believed she experienced retaliation. Vice President Sherstad falsely accused that returning complainant of being a lesbian contrary to the school's policies, forbid her materially from talking with her fellow female students in the workplace, required her to communicate only with the offending supervisor as a direct report, and advised her that she would face severe repercussions if she disobeyed.

## CIVIL CLAIMS

## COUNT 1: NEGLIGENCE
## Defendant Cooley

121. Plaintiffs hereby incorporate and reallege each and every paragraph above as if fully alleged against Defendant herein.

122. Anyone – professional or lay – who practices or uses recovered memory theory and/or techniques to encourage or assist someone in calling forth visions of sexual abuse by their family members can reasonably foresee that such family members would and will be harmed by negligently, fraudulently or otherwise improperly elicited "visions."

123.  An untrue accusation that someone committed sexual assault upon a child is damaging per se.

124.  An untrue accusation that someone committed murder is damaging per se.

125.  An untrue accusation that someone committed prostitution or sex trafficking is damaging per se.

126.  Anyone – professional or lay – who elicits or encourages another person to vocalize accusations or allegations of child sexual abuse, murder, prostitution or sex trafficking against their parents, siblings, aunts or uncles can reasonably foresee that such family members would foreseeably be harmed by false, negligent, fraudulent or otherwise improper allegations.

127.  Anyone who publishes or participates in the publication of accusations that a person's parents, siblings, aunts or uncles committed the kinds of conduct mentioned in the preceding five paragraphs can reasonably foresee that such family members would be harmed by false, negligent, fraudulent or otherwise improper allegations.

128.  Defendant Cooley owed the following duties to Plaintiffs to avoid foreseeable harm to them:

a. The duty to refrain from practicing psychology or mental healthcare without a license;

b. The duty to refrain from unreasonably eliciting false accusations against them of child sexual abuse or other heinous crimes;

c. The duty to refrain from unreasonably publishing, participating in the publication of, or aiding or abetting the publication of untrue accusations against them of child sexual abuse or other heinous crimes;

d. The duty to use reasonable methods when training, supervising or mentoring another person under one's authority and/or care, where such person's care foreseeably impacts other closely related third-parties such as their family; and among other duties,

e. The duty to act with reasonable care to avoid harming Plaintiffs.

129. Defendant Cooley breached his duties to Plaintiffs by:

a. As presumptive negligence, violating a criminal statute that prohibits the practice of psychology and other mental health care without a license;

b. Eliciting false accusations of child sexual abuse, as well as the other criminal conduct identified herein, against each of the Plaintiffs without taking reasonable steps to ensure the elicitation of reliable information;

c. Publishing or participating in the publication of false accusations of child sexual abuse, as well as the other criminal conduct identified herein, against each of the Plaintiffs without performing reasonable due diligence to corroborate or evaluate the available facts;

d. Failing to use reasonable methods of training, supervising or mentoring Plaintiffs' daughter/sister Elle when she was under his authority and/or care, including but not limited to engaging in the incompetent and unqualified teaching and use of recovered memory theory, avoiding Elle's conflicts of interest when she depended upon him for housing and food, and failing to seek reasonable guidance and training in

relation to his supervision of Elle, all in a manner that foreseeably harms Plaintiffs personally;

e. Unreasonably obtaining live-in maid, nanny and other personal services from a college intern under his supervision and authority in a way that foreseeably drove division with Plaintiffs and harmed them; and among other breaches,

f. Failing to take reasonable steps to avoid exacerbating harms to Elle's mental health in a way that foreseeably impacts Plaintiffs.

130. As the actual and foreseeable result of Defendant Cooley's breaches of duties to Plaintiffs, Elle has accused Plaintiffs of the heinous conduct above and has estranged herself from them.

131. Defendants have been damaged by Defendant Cooley's negligence herein in the following ways, among others:

a. Upon information and belief, the stress, sorrow and hardship imposed has shortened Plaintiff Lorene Roskamp's life and weakened her current ability to fight a disease that is expected to be terminal;

b.  Upon information and belief, the stress, sorrow and hardship imposed has shortened Plaintiff David Roskamp's life and weakened his current ability to fight major health conditions;

c.  The criminal accusations have caused per se reputational damages for each Plaintiff;

d.  Upon information and belief, the negligence has impacted and will continue to impact each Plaintiff's employment and commercial opportunities;

e.  To the extent recoverable, the negligence has destroyed the previously close and appropriately supportive familial relationship between each Plaintiff and Elle;

f.  The negligence has caused Plaintiffs Lorene and David Roskamp to incur fees for medical treatment that they otherwise would not have incurred;

g.  The negligence has caused Plaintiffs Lorene and David Roskamp to incur fees for outside experts and professional investigators, which they otherwise would not have incurred;

h. The negligence has so corrupted or otherwise harmed Elle's mental health, memory and/or relationships with Plaintiffs that mitigation is not currently possible;

i. Plaintiffs have incurred other damages including but not limited to pain and suffering, emotional distress, economic damages, and such other cognizable damages to be proven at trial.

WHEREFORE, Plaintiffs pray for damages in an amount not less than ten million dollars, as well as such other legal and equitable relief (including injunctive relief) as the Court deems appropriate following trial.

## COUNT 2: NEGLIGENCE
## Defendant Wolffis

132. Plaintiffs hereby incorporate and reallege each and every paragraph above as if fully alleged against Defendant herein.

133. Defendant Wolffis owed the following duties to Plaintiffs to avoid foreseeable harm to them:

a. The duty to refrain from practicing psychology or mental healthcare without a license;

41

b. The duty to refrain from unreasonably eliciting false accusations against them of child sexual abuse or other heinous crimes;

c. The duty to refrain from unreasonably publishing, participating in the publication of, or aiding or abetting the publication of untrue accusations against them of child sexual abuse or other heinous crimes; and among other duties,

d. The duty to act with reasonable care to avoid harming Plaintiffs.

134. Defendant Wolffis breached her duties to Plaintiffs by:

a. As presumptive negligence, violating a criminal statute that prohibits the practice of psychology and other mental health care without a license;

b. Eliciting false accusations of child sexual abuse, as well as the other criminal conduct identified herein, against each of the Plaintiffs without taking reasonable steps to ensure the elicitation of reliable information;

c. Publishing or participating in the publication of false accusations of child sexual abuse, as well as the other criminal

conduct identified herein, against each of the Plaintiffs without performing reasonable due diligence to corroborate or evaluate the available facts; and among other breaches,

d. Failing to take reasonable steps to avoid exacerbating harms to Elle's mental health in a way that foreseeably impacts Plaintiffs.

135. As the actual and foreseeable result of Defendant Wolffis's breaches of duties to Plaintiffs, Elle has accused Plaintiffs of the heinous conduct above and has estranged herself from them.

136. Defendants have been damaged by Defendant Wolffis's negligence herein in the following ways, among others:

a. Upon information and belief, the stress, sorrow and hardship imposed has shortened Plaintiff Lorene Roskamp's life and weakened her current ability to fight a disease that is expected to be terminal;

b. Upon information and belief, the stress, sorrow and hardship imposed has shortened Plaintiff David Roskamp's life and weakened his current ability to fight major health conditions;

c. The criminal accusations have caused per se reputational damages for each Plaintiff;

d. Upon information and belief, the negligence has impacted and will continue to impact each Plaintiff's employment and commercial opportunities;

e. To the extent recoverable, the negligence has destroyed the previously close and appropriately supportive familial relationship between each Plaintiff and Elle;

f. The negligence has caused Plaintiffs Lorene and David Roskamp to incur fees for medical treatment that they otherwise would not have incurred;

g. The negligence has caused Plaintiffs Lorene and David Roskamp to incur fees for outside experts and professional investigators, which they otherwise would not have incurred;

h. The negligence has so corrupted or otherwise harmed Elle's mental health, memory and/or relationships with Plaintiffs that mitigation is not currently possible;

i. Plaintiffs have incurred other damages including but not limited to pain and suffering, emotional distress, economic

damages, and such other cognizable damages to be proven at trial.

WHEREFORE, Plaintiffs pray for damages in an amount not less than ten million dollars, as well as such other legal and equitable relief (including injunctive relief) as the Court deems appropriate following trial.

## COUNT 3: AIDING AND ABETTING NEGLIGENCE
### Defendant Cooley

137. Plaintiffs hereby incorporate and reallege each and every paragraph above as if fully alleged against Defendant herein.

138. As alleged above, Defendant Wolffis was negligent.

139. Upon information and belief, in each respective case, Defendant Cooley knew about Wolffis's negligence in conducting dream therapy and recovered memory therapy, her negligent elicitation, negligent publication and other wrongs.

140. Upon information and belief, in each respective case, Defendant Cooley knowingly gave substantial material, physical, psychological, verbal and other assistance to Wolffis as she engaged in her misconduct.

141.  In each respective case, the negligence caused the damages described above.

WHEREFORE, Plaintiffs pray for damages in an amount not less than ten million dollars, as well as such other legal and equitable relief (including injunctive relief) as the Court deems appropriate following trial.

## COUNT 4: AIDING AND ABETTING NEGLIGENCE
## Defendant Wolffis

142.  Plaintiffs hereby incorporate and reallege each and every paragraph above as if fully alleged against Defendant herein.

143.  As alleged above, Defendant Cooley was negligent.

144. Upon information and belief, in each respective case, Defendant Wolffis knew about Cooley's negligence in conducting dream therapy and recovered memory therapy, his negligent elicitation, negligent publication and other wrongs.

145. Upon information and belief, in each respective case, Defendant Wolffis knowingly gave substantial material, physical, psychological, verbal and other assistance to Cooley as he engaged in his misconduct.

146.  In each respective case, the negligence caused the damages described above.

WHEREFORE, Plaintiffs pray for damages in an amount not less than ten million dollars, as well as such other legal and equitable relief (including injunctive relief) as the Court deems appropriate following trial.

## COUNT 5: VICARIOUS LIABILITY
### Defendant GCU

147.  Plaintiffs hereby incorporate and reallege each and every paragraph above as if fully alleged against Defendant herein.

148.  Unlike most other potential organizational defendants, colleges and universities operate to some extent *in loco parentis*. Parents and families are the foreseeable victims of its failures.

149.  At all times relevant, Defendant Cooley was acting within the course and scope of the authority Defendant GCU granted him over its student Elle Roskamp when he acted negligently and/or aided and abetted negligence and thereby caused the foreseeable harms articulated above.

WHEREFORE, Plaintiffs pray for damages in an amount not less than ten million dollars, as well as such other legal and equitable relief (including injunctive relief) as the Court deems appropriate following trial.

## COUNT 6: NEGLIGENCE
## Defendant GCU

150. Plaintiffs hereby incorporate and reallege each and every paragraph above as if fully alleged against Defendant herein.

151. A university owes certain responsibilities and duties that go beyond purely academic matters, which encompass counseling, support, personal development and nurturing. Parents and families who send their children to a university place reasonable faith that the institution will provide a reasonably supportive environment for their still-teenage children – an environment once summarized by the phrase *in loco parentis*.

152. Defendant GCU owed each of the Plaintiffs the following duties to Plaintiffs to avoid foreseeable harms to them:

a. The duty to perform some due diligence into the people it hires and/or engages to serve as internship professors who supervise students in GCU's for-credit internships;

b. The duty to provide some training for the people it hires and/or engages to serve as internship professors who supervise students in GCU's for-credit internships;

c. The duty to supervise the people it hires and/or engages to serve as internship professors who supervise its students in GCU's for-credit internships;

d. The duty to act reasonably to avoid harm to the parents and siblings of its students, including but not limited to:

    i. Avoiding the unnecessary destruction of family relationships based on false allegations;

    ii. Imposing such policies as fit GCU's guiding internal principles, ethics and other standards, which prescribe how people who supervise GCU's students will be selected, trained and supervised;

    iii. Taking minimally sufficient steps to enforce whatever policies GCU prescribes; and among other duties,

    iv. Providing minimally sufficient resources to avoid student susceptibility to delusional thinking and/or predatory exploitation by professors, administrators, officials, and other elders;

153. Defendant GCU breached its duties to Plaintiffs by:

a. Failing to perform due diligence into Defendant Cooley before giving him authority over Elle in either semester of her two semesters of GCU internships;

b. Failing to train Defendant Cooley before giving him authority over Elle in either semester of her two semesters of GCU internships;

c. Failing to supervise Defendant Cooley and his approach, actions and/or activities during either semester of Elle's two semesters of GCU internships; and among other breaches,

d. Failing to draft or implement such policies or take such other reasonable precautions as to avoid the reasonably foreseeable exploitation and/or manipulation of students like Elle, to the substantial detriment of her family.

154. As the actual and foreseeable result of GCU's negligence, Plaintiffs each incurred the same kinds and amounts of damages alleged and described above.

WHEREFORE, Plaintiffs pray for damages in an amount not less than ten million dollars, as well as such other legal and equitable relief (including injunctive relief) as the Court deems appropriate following trial.

FURTHER, and as a result of the misconduct alleged above, each Plaintiff respectfully requests that the Court enter a judgment jointly and severally against Defendants GCU, James P. Cooley and Morgan Wolffis in the amount of their actual damages to be proven in Court (anticipated to be not less than $10,000,000.00), as well as such other relief as the evidence and law support and the Court may deem proper.

## **JURY DEMAND**

Each Plaintiff further hereby demands a jury trial on all issues so triable in this case.

Dated: August 15, 2022

CLANCY ADVISORS PLC

By: _____
Saura J. Sahu (P69627)
Jeffrey S. Appel, Of Counsel
(P28296)
2723 S. State St., Suite 150
Ann Arbor, MI 48104
(734) 780-7595
sahu@clancyadvisors.com

*Attorneys for Plaintiffs*